# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 26, 2010

No. 08-31226

Lyle W. Cayce
Clerk

LOUIS THIBAULT, JR.

Plaintiff - Appellant

v.

BELLSOUTH TELECOMMUNICATIONS INC; ROBERT J PARKER, doing business as Parker Communications; DIRECTIONAL ROAD BORING INC; PARKER COMMUNICATIONS INC; ROBERT W PARKER; PARKER COMMUNICATIONS LLC

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before GARWOOD, WIENER, and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

Louis Thibault, Jr., (Thibault) brought suit against BellSouth Telecommunications (BellSouth), Directional Road Boring, Inc. (Directional), and Robert J. Parker, Robert W. Parker, and Parker Communications LLC (collectively Parker) arising out of electrical splicing work he performed in New Orleans, Louisiana in the aftermath of Hurricane Katrina. Thibault claimed violations of the Fair Labor Standards Act (FLSA), under 29 U.S.C. § 207(a)(1), a Louisiana state-law breach of contract, and failure to pay wages under LA. REV. STAT. ANN. § 23:631. The trial court dismissed these claims on summary

No. 08-31226

judgment. Thibault appeals the dismissal of the FLSA claim and the breach of contract claim.[1] We address two issues: first, whether Thibault may maintain a claim under the FLSA, and second, whether summary judgment is appropriate for his breach of contract claim.[2]

## BACKGROUND

As a result of Hurricane Katrina, BellSouth's telephone infrastructure suffered serious damage. BellSouth undertook the project of rewiring its entire New Orleans Area telecommunications grid. To complete this project, BellSouth employed "splicers." A splicer installs, cuts, repairs, and tests various high voltage cables. Because of Katrina, BellSouth could not, by itself, restore phone services to the region. Accordingly, BellSouth contracted with Directional to provide assistance with their project. Directional also employed their own splicers. But even Directional's additional splicers did not suffice. Directional therefore contracted with Parker to provide additional splicers for the project.

Parker contacted Bill Peek, a splicer in Delaware. Parker informed Peek that the job would require about eighty-four hours of work per week at an hourly rate of sixty-eight dollars and a fifty dollar per-diem. He also informed him that

---

[1] BellSouth and Directional filed cross claims against Parker arising out of Parker's duty to defend and indemnify. Parker filed a cross claim against Directional claiming Directional breached its contract with Parker by failing to pay the correct amount for splicers. The trial court resolved BellSouth and Directional's claims against Parker. At the time of this appeal, however, the trial court had not resolved Parker's cross claims against Directional. At the request of all parties, the district court entered an order under FED. R. CIV. P. 54(b) certifying as final judgments *nunc pro tunc* the judgment entered against Thibault. That order allows us to retain our jurisdiction over the case. *See St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 338 & n.6 (5th Cir. 1997).

[2] Thibault has not briefed or appealed the summary judgment on his claim under Louisiana wage law statutes. Therefore, we do not address that claim and the judgment as to it is affirmed.

No. 08-31226

splicers would have to provide their own bucket trucks and tools to do the work. Mr. Peek was interested, and told his best friend, Lewis Thibault, of the job opportunity. Mr. Thibault was not a splicer by profession, but had experience as a navy jet engine mechanic. He owned and operated his own business in Delaware called K & L Sales, Inc. His business sold picnic tables, storage buildings, and golf carts. In 2005, his business made over $500,000 in gross profit. Despite his success, Thibault decided to accept Peek's invitation to travel to New Orleans as it would provide a much needed break for him from his marital problems and he felt New Orleans would be an opportunity to "get [his] head clear." Through Peek, Thibault was able to borrow a spare truck and various tools that the job required. Peek also taught Thibault the basics of splicing over the course of an evening; Thibault was able to learn the rest on the job.

In October, Thibault filled his trailer home with water and food, and the two men drove to Louisiana. From October 4, 2005 to January 6, 2006, Thibault worked as a splicer. In that time, Thibault made $51,628. Everyday, Thibault was required to report to Kenner Yard, a property rented by BellSouth. At the first meeting, Thibault claims that a Parker supervisor informed them that they would be paid sixty-eight dollars an hour, would work at least eighty-four hours a week and would get a per diem and a place to park his motor home. Every day, Thibault showed up to Kenner Yard, and was assigned a specific splicing job in New Orleans. BellSouth engineers created the overall rewiring plan for New Orleans. BellSouth supervisors designated the specific jobs to be done daily, and assigned Directional supervisors to distribute the assignments. When Thibault received his assignment, he was then required to take his truck to the job and

3

No. 08-31226

work on the problem he was assigned.  When completed, Thibault would return to Kenner Yard and would be assigned another splicing job.   He worked in thirteen-day intervals with a one-day break in between.  While Parker paid Thibault, BellSouth had to approve all vacation and break time.  On January 6, Parker laid off Thibault.  Directional offered Thibault a job as a splicer, working directly for Directional, but Thibault declined.  Instead, he returned to Delaware, and has not worked as a splicer since.  Thibault brought this suit against Parker, Directional, and BellSouth for overtime pay under the FLSA, breach of contract, and Louisiana wage law statutes.

## ANALYSIS

### I.  Fair Labor Standards Act

Thibault contends that he is entitled to overtime compensation for hours worked in excess of forty hours per week pursuant to the 29 U.S.C. § 207(a)(1). The FLSA gives employees[3] certain protections from employers.  The defendants contend that Thibault is not an employee, but an independent contractor.  We review Thibault's status *de novo*.  *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332 (5th Cir. 1993).  In the present setting, a relevant question is whether the alleged employee so economically depends upon the business to which he renders his services, such that the individual, as a matter of economic reality, is not in business for himself.  *Id*.  The contractual designation of the worker as an independent contractor is not necessarily controlling.  *See Hopkins v. Cornerstone Am*., 545 F.3d 338, 346 (5th Cir. 2008).  Instead, we generally use as a guide five, non-exclusive factors:  (a) the permanency of the relationship; (b) the degree of

---

[3] The FLSA defines "employee" to mean "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  "'Employ' includes to suffer or permit to work" *Id*. § 203(g).

No. 08-31226

control exercised by the alleged employer; (c) the skill and initiative required to preform the job; (d) the extent of the relative investments of the worker and the alleged employer; and (e) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer. *Id.* at 332–33. These factors are merely aids to analysis and no single factor is determinative. *Id.* at 332.

Here, we believe the holding of *Carrell* provides substantial guidance. In *Carrell*, this Court faced the issue of whether twenty welders were employees under the FLSA for purposes of overtime compensation. *Id.* The *Carrell* court went through each of the five factors, and decided overall that the welders were independent contractors. *Id.* at 334.

*A. The Permanency of the Relationship*

First, *Carrell* addressed the permanency of the relationship:

"During each of the years relevant to this lawsuit, none of the Welders worked exclusively for Sunland. To work consistently throughout the construction season, which lasts six to nine months, the Welders moved from job to job, company to company, and state to state. Sunland hired the Welders on a project-by-project basis, but made an effort to move the Welders to subsequent projects. The duration of Sunland's construction projects averaged six weeks, but some projects lasted only a few days. The average number of weeks that each Welder worked per year for Sunland varied from approximately 3 weeks to 16 weeks."

*Id.* at 332. Like the welders, Thibault did not work exclusively for the defendants. He had his own business selling picnic tables, storage buildings, and customized golf carts, in his home state of Delaware. The nature of splicer work requires travel to different parts of the nation where the jobs are. Splicers travel from job-to-job and from state-to-state looking for work. Thibault and Peek traveled from Delaware to work in the aftermath of Hurricane Katrina. The

5

project lasted only until the re-wiring project after Katrina finished. Thibault intended to return to Delaware after seven or eight months.

B. *Degree of Control*

Second, the *Carrell* court addressed the degree of control exercised by the employer:

> "While working for Sunland, the Welders performed only pipe-welding work. Sunland assigned the Welders to specific welding work and maintained daily time records for each Welder. Sunland, however, did not specify the amount of time that a Welder could spend on an assignment. Sunland required the Welders to work the same days and hours as the remainder of Sunland's crew, including taking the same daily break periods."

*Id*. at 333. The court also relied on the fact that Sunland classified the welders as independent contractors, and many of the welders considered themselves self-employed. Here, the defendants considered the splicers independent contractors. Many of the splicers considered themselves self-employed. The *Carrell* welders did only welding, and similarly here Thibault only performed splicing work. The defendants assigned the splicers to specific splicing work and maintained daily time records for each splicer. BellSouth required the splicers to work the same days and hours as the remainder of the BellSouth crew, including taking the same daily break periods. In *Carrell*, Sunland did not control the manner and method of pipe welding. *Carrell*, 998 F.2d at 332. Likewise, Thibault explained that his supervisors would only come by occasionally, and never specified how Thibault should do the splicing. According to Thibault, the defendants would tell him what needed to be fixed or spliced or give him blueprints, and then it was up to Thibault to go out and fix the problem. Once Thibault finished a particular job, he would report back to be assigned another job.

*C.  Skill & Initiative*

Third, *Carrell* examined the skill an initiative required:

"Pipe welding, unlike other types of welding, requires specialized skills. That the gas companies tested and certified each Welder before a job demonstrates the specialized nature of the work. As for the initiative required, a Welder's success depended on his ability to find consistent work by moving from job to job and from company to company. But once on a job, a Welder's initiative was limited to decisions regarding his welding equipment and the details of his welding work."

*Id.* at 333.  Thibault argues that he has never worked as a splicer before. Thibault, however, was a jet engine mechanic in the navy.  In fact, he described his abilities: "I aced the mechanical aptitude test in the Navy.  You show me how to do something one time and I can do it."  Thibault learned the job from his friend Peek, but also learned how to splice on the job, working next to Peek and other splicers.   Thibault explained that splicing dealt with complicated equipment:

"I mean, you're talking – you're talking phone cables this big around coming into a cross box, and there might be six of them in there.  And each wire has 3,200 pairs in it, which is 7,400 wires.  And its all going to these terminals.  And you had to make sure they were going in at the right terminal and coming out at the right terminal."

Like Thibault, individuals learn to splice through an informal apprenticeship. A fellow splicer testified that it took him  about a year to learn the job.  Like the welders in *Carrell*, the splicers' success depended on their ability to find consistent work by moving from job-to-job.

*D.  Relative Investements*

The fourth factor the *Carrell* court examined was the relative investments of the worker and the alleged employer.  *Carrell*, 998 F.2d at 333.  The court in

*Carrell* "recognized" the overall investment by the alleged employer, but it did not focus on it, as Thibault does in his brief. Instead, *Carrell* compares the amount the alleged employer and employee each contribute to the specific job the employee undertakes. *Id.* For example, the welders supplied their own trucks, welding machines mounted on the trucks, and other specialized welding tools. *Id.* The welders also assumed the costs of operating and maintaining the trucks and tools. *Id.* The welders provided their own lodging and own meals. *Id.* They often bought their own assistants, who appear to have been unskilled or semi-unskilled laborers. *Id.* at 333 n.3. The alleged employer in *Carrell* provided general liability and worker's compensation insurance. *Id.* at 333. It provided the blades for the grinders that smoothed the surface of a pipe before it was welded. *Id.* at 333 & n.2.

Like the welders in *Carrell*, Thibault provided his own bucket truck, cable splicer, pump, ventilator, ladder, climbing belt, harness, hard hat, safety vest and other miscellaneous tools (such as wrenches, hammers, screwdrivers and other items one would usually find in a toolbox). In fact, the record contains a list of over 100 different tools splicers were expected to have for the job. Thibault had his own motor home, which he brought to Louisiana to live in. He stocked it with enough water and food to last him at least six weeks. He drove two days to get to New Orleans. We also "recognize[]" the overall investment by the defendants. *Carrell*, 998 F.2d at 333. Unlike *Carrell*, however, we could not find, nor has Thibault pointed to, any evidence in the record of paying for general liability insurance. BellSouth did rent property in the area and built a shed and trailer as a base of operations. BellSouth also provided the materials used in the splicing: connectors, bonding straps, ground rods, terminal blocks, pedestals,

cable, and drop wire, for example. The materials that BellSouth provided were either incorporated into their network or brought back to Kenner Yard at the end of the day. Parker, on the other hand, did not provide any materials, meals or other services. Instead, Parker's involvement in splicing seems limited to keeping track of the men and the hours. There was some evidence to suggest that Parker paid for worker's compensation insurance.

*E. Worker's Opportunity for Profit & Loss*

Fifth and finally, the *Carrell* court examined the degree to which the worker's opportunity for profit and loss is determined by the alleged employer:

> "Sunland did not solicit bids or proposals from the Welders. It paid the Welders a fixed hourly rate of $23, plus $10 per day for rental of their grinders. Sunland intended approximately 40% of the $23 hourly rate to compensate the Welders for supplying their own welding equipment. Sunland required the Welders to submit invoices for work performed on Sunland projects. On appeal, the Welders stress that Sunland exclusively controlled the Welders' compensation while they worked on a Sunland project: Sunland rarely deviated from its hourly rate, and it controlled the number of hours that the Welders worked. . . .
>
> [A] Welder's year-end profits or losses as a welder depended on his ability to consistently find welding work with other companies and to minimize welding costs.
>
> . . . .
>
> Sunland exerted some control over the Welders' opportunity for profits by fixing the hourly rate and the hours of work. Yet, the tax returns of Carrell indicate that the Welders' profits also depended on their ability to control their own costs. Moreover, the Welders worked for numerous companies in each of the years relevant to this dispute."

*Carrell*, 998 F.2d at 333–34. Thibault worked for a fixed hourly rate of $68 per hour, plus $50 per day per diem. The defendants required the splicers to fill out

time sheets and invoices of the work performed. Like the *Carrell* welders, the splicers' year-end profits or losses depend on their ability to consistently find splicing work with other companies. Thibault's friend, Bill Peek testified that, even though he lived in Delaware, splicing requires travel from job-to-job across the country. The splicers here increased profits by controlling costs (repairs, supply costs, food, water, housing, etc.).

### F. Other Factors

The determination of whether an individual is an employee or independent contractor is highly dependent on the particular situation presented. *Carrell*, 998 F.2d at 334. We do not hold that *all* splicers are always independent contractors. Indeed, the nature of this analysis suggests that in some cases splicers might be employees. *E.g.*, *Cromwell v. Driftwood Elec. Contractors, Inc.*, No. 09-60212, 2009 WL 3254467, at *3 (5th Cir. 2009) (unpublished). In *Cromwell*, for example, the court found the splicers were employees. *Id.* Like Thibault, the *Cromwell* splicers worked twelve hour days, were paid by the hour, provided their own tools and trucks, and were assigned specific repair jobs each day. *Id.* at *1. *Cromwell* compared that case to *Carrell* and *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir. 1983) (holding welders were employees under the FLSA). The *Cromwell* panel aptly noted, "the facts of this case lie somewhere between those of *Carrell* and *Robicheaux*." *Cromwell*, 2009 WL 3254467, at *2. Likewise, *Carrell, Cromwell* and *Robicheaux* are useful case studies in resolving this case. We believe Thibault falls squarely within *Carrell*. *Cromwell* made a distinction from the *Carrell* welders that does not apply to Thibault. Unlike the welders, the splicers in *Cromwell* did "not have the same temporary, project-by-project, on-again-off-again relationship with their purported employers." *Id.* at *2. Also,

No. 08-31226

a relevant distinction from *Cromwell* relates to the matter of economic independence: whether Thibault is in business for himself. *Carrell*, 998 F.2d at 334.

The circumstances of Thibault's employment reflect that he is not economically dependant on the defendants. Unlike *Cromwell*, evidence shows that Thibault is a sophisticated, intelligent business man who entered into a contractual relationship to perform a specific job for the defendants. Thibault worked for three months and his relationship to the defendants centered solely around the specific project. After splicing in New Orleans, Thibault returned to his company in Delaware and has not worked as a splicer since. For "tax reasons," Thibault had Parker make all payments directly to his company, K & L Sales, Inc. In 2005, K & L Sales generated $500,503 in profit and $2,492,997 in gross sales.[4] *When* he worked as a splicer, he *also* oversaw K & L Sales operations and its multiple employees. As the owner of K & L Sales, Thibault routinely contracted with product manufacturers, customers, and transporters. He owned eight drag-race cars and also generated $1,478 in income from racing professionally. In 2005 and 2006, he also owned and managed commercial rental property that generated some income.[5]

---

[4] An individual's wealth is not a solely dispositive factor in the economic dependence question. In 2005, Thibault reported an adjusted gross income of $82,951. His 1099 from Parker reported $45,584 in non-employee compensation.

[5] The plaintiff primarily relies upon *Hopkins v. Cornerstone Am.* to argue that he was economically dependant on the defendants. The employer in *Hopkins*, however, has significantly more economic control over its employees than defendants in the instant case had over Thibault or the other similar splicers here. For example, the sales leaders in *Hopkins* worked for the employer for years and were not allowed to work for other companies or themselves. *Id.*, 545 F.3d at 346. The employer prevented the sales leaders from owning and operating other businesses. *Id.* at 344. Further, the court found that the sales leaders

11

No. 08-31226

Because we hold that the summary judgment record does not contain sufficient evidence to support a finding that Thibault was an FLSA employee while performing splicer services, we affirm the judgment dismissing the FLSA claims.[6]

## II.  Breach of Contract

Thibault also appeals the dismissal of his Louisiana law breach of contract claim.  Specifically, he argues the defendants promised him six months of employment and breached that agreement when they fired him after three months of work.[7]  The district court held that the plaintiff did not produce any summary judgment evidence that Thibault was hired for a fixed term.  Under Louisiana law, "[a]bsent a specific contract or agreement establishing a fixed term of employment, an employer is at liberty to dismiss an employee at any time for any reason without incurring liability for the discharge." *Chapman v. Ebeling*, 945 So. 2d 222, 226 (La. App. 2 Cir. 2006).  There needs to be an "objectively determinable end to [Thibault's] employment" defined when he is hired. *Overman v. Fluor Constructors, Inc.*, 797 F.2d 217, 220 (5th Cir. 1986).  Under Louisiana law:

> "No single foreseeable event triggered the end of his job. . . . The time
> when his services would no longer be needed depended on a number
> of factors and, ultimately, on the judgment of his supervisor. Such a

---

exhibited no specialized skills.  *Id.* at 345.

[6] Because Thibault was not an employee, we need not address Thibault's contention that the defendants were joint employers under the FLSA.

[7] In the trial court, Thibault also brought a breach of contract claim based on a promise that  Parker would provide him a paid location to keep his motor home.  Since Thibault does not present this as an issue on appeal and does not brief it, we do not address it and hold any such claim has been waived by him.

No. 08-31226

flexible relationship, promising employment until one's services are no longer needed, does not establish a fixed term, and, therefore, in Louisiana at least, must be regarded as employment at will."

*Id.* at 220.

Thibault did not produce sufficient summary judgment evidence to sustain a finding of an agreement to a fixed term. The evidence that Thibault points to does not specifically relate to any relationship or agreement between one of the defendants and himself for a term of six months: (1) BellSouth's leasing of Kenner Yard for a two year term; (2) BellSouth's agreement requiring Directional to supply splicers for a period of at least one year; and (3) Parker's subcontract requiring Parker to supply splicers to Directional for at least one year. These actions are consistent with having no agreement with any specific splicer. They certainly do not even imply a contract with any specific splicer for a term of six months. Next, Thibault argues that an email from the Directional vice president that says splicer pay would remain the same for about 120 to 150 days (four to five months) suggests a six month contract. This does not get Thibault to the six month contract he seeks. An employer is free to ensure a group of employees that their rate of pay would not decrease without committing itself to a contractual relationship with each specific employee for a completely unrelated fixed term.

Thibault also points us to the length of other splicer's employment: (1) Chris Floyd's employment lasted two years; and (2) Bill Peek's testimony that there would be at least six months of work. First, Floyd was an actual employee of BellSouth who managed the construction project, not a splicer like Thibault. Floyd's agreement does not speak to any agreement between Thibault and any defendant. Second, Peek was questioned about the length of the work:

13

"Q. And what did you talk – what did – what was talked about during this meeting with [the Directional supervisor] about the length of the job?

A. Well, he said we had at least six months, and it was probably a whole lot longer than that, but it would depend on our job quality and – you know, just a pep talk to make everybody do good jobs if you wanted to stay longer than six months, or whatever."

Peek's testimony does not show any objectively determinable end to the term of employment. *See Overman*, 797 F.2d at 220. According to this testimony, the end of the term could have been any time after six months. Finally, Peek testified that the job specifically depended upon the quality of work by the splicers. This testimony suggests that "[t]he time when [Thibault's] services would no longer be needed depended on a number of factors and, ultimately, on the judgment of his supervisor." *Id.*

Our review of the record does not demonstrate any evidence of the existence of a fixed term either. Bill Peek handled all the communication with Parker before arriving in New Orleans. Once in Louisiana, Thibault testified that Dan Keener, a supervisor for Parker, and others, promised him that the work would last "at least six months" guaranteed, but that the work would "probably" take up to two years. Later in Thibault's deposition, this exchange occurred:

"Q. All right. You talked earlier about a guarantee of six months of employment. Did anyone from Directional or BellSouth ever guarantee to you six months of employment?

. . .

A. The question that I have is 'guaranteed.' We were told . . . we were probably going to be there for two years. Did he guarantee it? No. 'Chances are we're going to be here for a long time, fellows. I mean, look at it.'

Q. That's what he said?

A. Yeah, I mean, look at it. They're still out there working.

Q. All right. So it's true no one from BellSouth guaranteed you six months of employment; right?

A. Correct.

. . .

A. 'Guarantee' is the key word in that question.

Q. Well, did anyone from BellSouth promise you six months of work?

A. BellSouth and Directional said that we were going to be here for a long time."

Thibault's testimony has the same problems that Peek's testimony had in establishing a fixed term of employment. Thibault himself had a problem with the word "guarantee," and could not testify that the defendants guaranteed anything. According to Thibault, he was told about the length of the project, not a specific promise or guarantee about the length of time he would be employed. On this record, we do not find sufficient summary judgment evidence to sustain a finding of a fixed term of employment for six months.

## CONCLUSION

We affirm the judgment of the trial court because, first, Thibault was not covered by the FLSA because there is no summary judgment evidence sufficient to sustain a finding that he was an employee under the act and, second, there is no summary judgment evidence sufficient to sustain a finding that Thibault had a contract for a fixed term.

AFFIRMED.

15